**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DIAMOND MOTORWORKS, individually and as the representatives of a class of similarly situated persons and entities,<br><br>       Plaintiff(s),<br><br>v.<br><br>WYNDHAM DESTINATIONS, INC, RCI, LLC, and JOHN DOE DEFENDANTS,<br><br>       Defendants. | Civil Action No. 1:19-cv-06950<br><br>**JURY DEMANDED** |

## CLASS ACTION COMPLAINT

NOW COMES the Plaintiff, DIAMOND MOTORWORKS ("Plaintiff"), by through its attorney, James C. Vlahakis, and asserts this this putative class action pursuant to the Telephone Consumer Protection Act of 1991, 47 USC §227, *et seq.* (at times the "TCPA") and Federal Rule of Civil Procedure 23(a) and 23(b)(3):

### I.      Parties, Jurisdiction and Venue

1.      Plaintiff is an Illinois corporation, located in Lisle, Illinois.

2.      Plaintiff maintains a telephone number, (630) 579-5920 (the "Facsimile Number"), which is connected to a device that utilizes hardware and software to allow the device to receive, store and print facsimiles (the "Facsimile Machine").

3.      The Facsimile Machine is located within this District.

4.      Defendant Wyndham Destinations, Inc. ("Wyndham"), is incorporated in the State of Delaware with is principal office located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

5.      Wyndham's registered agent is Corporate Creations Network, Inc., and for the purposes of serving Wyndham, Corporate Creations Network, Inc. is located at 11380 Prosperity Farm Road Suite 221E, Palm Beach Gardens, Florida 33410.

6.      Defendant RCI is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located at 14 Sylvan Way, Parsippany, New Jersey 07054.

7.      RCI's registered agent is Corporate Creations Network Inc., and for the purposes of serving RCI, Corporate Creations Network, Inc. is located at 3411 Silverside Road, Tatnall Building, Ste. 104, Wilmington, Delaware 19810.

8.      Wyndham and RCI are a corporate entity of some type or an individual and therefore is a "person" as defined by 47 U.S.C. §153(39).

9.      Upon information and belief, the currently unknown JOHN DOE DEFENDANTS are affiliates of RCI.

10.      Alternatively, upon information and belief, the currently unknown JOHN DOE DEFENDANTS are affiliates of Wyndham.

11.      Upon information and belief, the JOHN DOE DEFENDANTS send unsolicited advertising facsimiles on behalf of and for the financial benefit of RCI, with RCI's knowledge and approval.

12.      Upon information and belief, the JOHN DOE DEFENDANTS send unsolicited advertising facsimiles on behalf of and for the financial benefit of Wyndham, with Wyndham's knowledge and approval.

13.      As detailed below in Section VI, Wyndham and RCI are each vicariously liable for any violations of the TCPA caused by the JOHN JOE DEFENDANTS.

14.      The JOHN DOE DEFENDANTS are a corporate entity of some type or an individual and therefore is a "person" as defined by 47 U.S.C. §153(39).

15.     This Court has personal jurisdiction over Defendants because they transacted business within this judicial district through its actions of sending over forty unsolicited advertisements facsimile transmission to telephone facsimile machines located within the State of Illinois, and in particular, this judicial district.

16.     As detailed below, Defendants have also committed tortious acts within this judicial district by and through the sending of unsolicited facsimile advertisements to Plaintiff, and upon information and belief, to other similar unsolicited advertising facsimiles to this judicial district.

17.     Venue is proper because the subject facsimiles were sent to and received within this judicial district.

18.     Supplemental jurisdiction exists for Plaintiff's state law claim under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq.

## II.    Summary Of The TCPA

19.     The TCPA makes it unlawful for any person to "use any telephone facsimile machine, computer or other device to send, to a telephone facsimile machine, an unsolicited advertisement."  47 U.S.C. §227(b)(1)(C).

20.     "The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise."  47 U.S.C. §227(a)(5).

21.     "The term 'telephone facsimile machine' means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper."  47 U.S.C. §227(a)(3).

3

22.     Congress enacted the TCPA to combat unsolicited facsimiles:

> Congress also took account of the "interference, interruptions, and expense" resulting from junk faxes, emphasizing in the same Report that "[i]n addition to the costs associated with the fax advertisements, when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications."

*See,* Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order, 18 FCC Rcd 14014, 14131-32 (2003) (the "2003 TCPA Report and Order") at para. 201 (quoting H.R. REP. NO. 102-317 at 25 (1991)).[1]

23.     Unsolicited facsimiles prevent telefax machines from receiving authorized facsimiles, prevent their use for authorized outgoing facsimiles, cause undue wear and tear on the recipients' telefax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited advertising message.

24.     The prohibitions of TCPA is not limited to unsolicited facsimiles that are sent to "conventional stand-alone telephone facsimile machine."

25.     According to the FCC's 2003 TCPA Report and Order:

> We conclude that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes . . . . The record confirms that a conventional stand-alone telephone facsimile machine is just one device used for this purpose; that developing technologies permit one to send and receive facsimile messages in a myriad of ways. Today, a modem attached to a personal computer allows one to transmit and receive electronic documents as faxes. "Fax servers" enable multiple desktops to send and receive faxes from the same or shared telephony lines.

> The TCPA's definition of "telephone facsimile machine" broadly applies to any equipment that has the capacity to send or receive text or images. The purpose of the requirement that a "telephone facsimile machine" have the "capacity to transcribe text or images" is to ensure that the prohibition on unsolicited faxing not be circumvented. Congress could not have intended to allow easy

---

[1] The 2003 TCPA Report and Order can be found at the following web address: https://apps.fcc.gov/edocs_public/attachmatch/FCC-03-153A1.pdf.

circumvention of its prohibition when faxes are (intentionally or not) transmitted to personal computers and fax servers, rather than to traditional stand-alone facsimile machines.

*See*, FCC's 2003 TCPA Report and Order at paras. 200, 201.

26.     Pursuant to the TCPA, the person or entity sending an advertising facsimile bears the burden of proof as to whether it had permission of the facsimile recipient to send an unsolicited facsimile advertisement.  47 U.S.C. §227(b)(1)(C)(i).

27.     One way a sending party can demonstrate permission is through demonstrating an established business relationship (an "EBR") with the receiving party.

28.     The burden of proving EBR is on the party that sends a facsimile.

29.     According to the Report and Order and Third Order on Reconsideration (the "2006 FCC Order").

> 12.  To ensure that the EBR exemption is not exploited, we conclude that an entity that sends a facsimile advertisement on the basis of an EBR should be responsible for demonstrating the existence of the EBR. The entity sending the fax is in the best position to have records kept in the usual course of business showing an EBR, such as purchase agreements, sales slips, applications and inquiry records.  We emphasize that we are not requiring any specific records be kept by facsimile senders. Should a question arise, however, as to the validity of an EBR, the burden will be on the sender to show that it has a valid EBR with the recipient.
>
> * * *
>
> 14.  In the event a recipient complains that its facsimile number was not provided to the sender, the burden rests with the sender to demonstrate that the number was communicated in the context of the EBR.
>
> 15.  . . . We also reiterate that senders of facsimile advertisements must have an EBR with the recipient in order to send the advertisement to the recipient's facsimile number. The fact that the facsimile number was made available in a directory, advertisement or website does not alone entitle a person to send a facsimile advertisement to that number.

*See*, https://apps.fcc.gov/edocs_public/attachmatch/FCC-06-42A1.pdf.

30.    The TCPA prohibits the sending of unsolicited advertising facsimiles to traditional, stand-alone facsimiles machines, as well as computerized facsimile delivery systems.

31.    The TCPA authorizes an aggrieved person to be awarded statutory damages of $500 for each unlawful facsimile. 47 U.S.C. § 227(b).

32.    The TCPA allows a court "in its discretion" to increase the award up to a maximum of treble damages where a defendant "willfully or knowingly violated" the statute. 47 U.S.C. § 227(b)(3). "Willfully" and "knowingly" are not defined by any specific section of the TCPA.

33.    The Communications Act of 1943, which contains the TCPA, defines acting "willfully" as a voluntary act, but does not require knowledge that the act violates the statute. The terms "willfully" or "knowingly" simply require that the actions of Defendant(s) to be intentional or volitional, as opposed to accidental or inadvertent. Plaintiff is not required to demonstrate that Defendant(s) must have known that the conduct would violate the statute. *See Sengenberger v. Credit Control Services, Inc.*, 2010 U.S. Dist. LEXIS 43874, 2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010), [*22] adhered to on reconsideration, No. 09 C 2796, 2010 U.S. Dist. LEXIS 142528, 2010 WL 6373008 (N.D. Ill. June 17, 2010).

34.    The plain language of 47 U.S.C. § 227(b) makes the sender of an unauthorized commercial facsimile strictly liable, so interpreting "willfully" as requiring a volitional act.  Plaintiff "need not prove that [D]efendant[s] had knowledge of the TCPA's provisions in order to establish that the [D]efendant[s] willfully or knowingly violated the TCPA." *Stewart v. Regent Asset Mgmt. Solutions*, 2011 U.S. Dist. LEXIS 50046, 2011 WL 1766018, at *2 (N.D. Ga. May 4, 2011) (citing *Charvat v. Ryan*, 116 Ohio St. 3d 394, 2007-Ohio-6833, 879 N.E.2d 765, 770).

**III.    Defendants' Affiliations, Businesses and Facsimile Based Marketing**

35.    Wyndham is the hospitality and vacations industries.

36.    Wyndham is the parent company of RCI.

37.    RCI is a brand and subsidiary of Wyndham.

38.    RCI is in business of timeshare properties.

39.    As depicted by Wyndham's "about-Wyndham" webpage, it describes itself as, "the world's largest vacation ownership, exchange and rental company."



See, https://www.wyndhamdestinations.com/about-wyndham/our-company

40.    The above website image existed during 2019, and was screen capture on October 22, 2019.

41.    According to Wyndham's 2018 annual report ("annual report"), Wyndham has "over 4,300 affiliated resorts through RCI."

42.    The relevant portion of Wyndham's annual report is depicted below:

ITEM 1.   BUSINESS

**Company Overview**

We are the world's largest vacation ownership and exchange company. We offer everyday travelers the opportunity to own, exchange or rent their vacation experience while enjoying the quality, flexibility and value that we deliver. Our global presence in approximately 110 countries means more vacation choices for our over four million members and owner families, with 224 resorts that offer a contemporary take on the timeshare model - including vacation club brands Club Wyndham, WorldMark by Wyndham, and Margaritaville Vacation Club by Wyndham - over 4,300 affiliated resorts through RCI, the world's leader in vacation exchange, and over 9,000 rental properties from coast to coast through Wyndham Vacation Rentals, North America's largest professionally managed vacation rental business.

43.     According to Wyndham's annual report, Wyndham uses several marketing channels including "direct mail, email, social media, telemarking, online distribution channels, brochures and magazines."

44.     The relevant portion of Wyndham's annual report is depicted below:

*Marketing*

We market our services and products to our customers using our five primary consumer brands and other related brands in more than 130 offices worldwide through several marketing channels including direct mail, email, social media, telemarketing, online distribution channels, brochures and magazines. Our core marketing strategy is to personalize and customize our marketing to best match customer preferences. We have a comprehensive social and mobile media platform including apps for smartphones and tablets, Facebook and Pinterest fan pages, several Twitter and Instagram accounts and YouTube channels, online video content and various online magazines. We use our resort directories and periodicals related to the vacation industry for marketing as well as for member retention and loyalty. Additionally, we promote our offerings to owners of resorts and vacation homes through trade shows, online and other marketing channels that include direct mail and telemarketing.

45.     Furthermore, Wyndham uses "marketing alliance" and "telemarketing efforts" in relation to its sales and marketing activities, according to its annual report.

46.     The relevant portion of the annual report is depicted below:

*Sales and Marketing*

We employ a variety of marketing channels to encourage prospective owners of VOIs to tour our properties and attend sales presentations at our resort-based sales centers as well as off-site sales offices. Our resort-based sales centers also enable us to actively solicit upgrade sales to existing owners of VOIs while they vacation at our resorts. We operate a tele-sales program designed to market upgrade sales to existing owners of our products. Sales of VOIs relating to upgrades represented 62%, 65% and 67% of our core VOI sales during 2018, 2017 and 2016, respectively.

We use a variety of marketing programs to attract prospective owners, including sponsored contests that offer vacation packages or gifts, targeted mailings, outbound and inbound telemarketing efforts, and in association with Wyndham Hotels brands, other co-branded marketing programs and events. We also partner with Wyndham Hotels by utilizing the Wyndham Rewards loyalty program to offer Wyndham Rewards points as an incentive to prospective VOI purchasers, and by providing additional redemption options to Wyndham Rewards members. We co-sponsor sweepstakes, giveaways and promotional programs with professional teams at major sporting events and with other third parties at high-traffic consumer events. Where permissible under state law, we offer cash awards or other incentives to existing owners for referrals of new owners.

New owner acquisition is an important strategy for us as this will continue to maintain our pool of "lifetime" buyers of vacation ownership and thus enable us to solicit upgrade sales in the future. We believe the market for VOI sales is under-penetrated, and estimate that there are 53 million U.S. households that are potential purchasers of VOIs. We added approximately 37,000, 36,000 and 33,000 new owners during 2018, 2017 and 2016, respectively.

Our marketing and sales activities are often facilitated through marketing alliances with other travel, hospitality, entertainment, gaming and retail companies that provide access to such companies' customers through a variety of co-branded marketing offers. Our resort-based sales centers, which are located in popular travel destinations throughout the U.S., generate substantial tour flow by enabling us to market to tourists already visiting these destinations. Our marketing agents, who often operate on the premises of the hospitality, entertainment, gaming and retail companies with which we have alliances, solicit tourists with offers relating to entertainment activities and other incentives in exchange for the tourists visiting the local resorts and attending sales presentations.

An example of a marketing alliance through which we market to tourists visiting destination areas is our current arrangement with Caesars Entertainment in Las Vegas, Nevada. This arrangement enables us to operate concierge-style marketing kiosks throughout select casinos and permits us to solicit patrons to attend sales presentations with casino-related rewards and entertainment offers, such as gaming chips, show tickets and dining certificates. We also operate our primary Las Vegas sales center within Harrah's Casino Hotel, Las Vegas, and regularly shuttle prospective owners targeted by such sales centers to and from our nearby resort property.

47.     According to Wyndham's annual report, Wyndham relies on third-party service provides and he relevant portion of Wyndham's annual report is depicted in the below image:

**We rely on information technologies and systems to operate our business, which involves reliance on third-party service providers and on uninterrupted operation of service facilities.**

We rely on information technologies and systems to operate our business, which involves reliance on third-party service providers and on uninterrupted operation of service facilities, including those used for reservation systems, payments systems, vacation exchange systems, property management, communications, procurement, member record databases, call centers, operation of our loyalty programs and administrative systems. We also maintain physical facilities to support these systems and related services. Any natural disaster, cyberattack, disruption or other impairment in our technology capabilities and service facilities or those of our third-party service providers could result in denial or interruption of service, financial losses, customer claims, litigation or damage to our reputation, or otherwise harm our business. In addition, any failure of our reservation systems, as a result of failures related to us or our third-party providers, may deter prospective resort owners from entering into agreements with us, and may expose us to liability from other parties with whom we have contracted to provide reservation services. Similarly, failure to keep pace with developments in technology could impair our operations or competitive position.

48.     In October 2019, RCI's website stated that it "remains the leader in vacation exchange."



*See*, https://www.rci.com/pre-rci-en_US/explore-rci/about-rci/about-rci-index.page?track1=Navigation_Prelogin&track2=About&track3=Text:About_RCI

49.     The above screen capture was obtained on October 22, 2019.

50.     According to Wyndham's annual report, RCI is Wyndham's exchange and rental brand.

51.     The relevant portion of Wyndham's annual report related to RCI is depicted below:

*Our Exchange and Rentals Brands*

We operate under the following brands:

**RCI**

Founded in 1974, RCI operates the world's largest vacation ownership weeks-based vacation exchange network, RCI Weeks, and provides members with the ability to exchange week-long intervals in units at their home resort for intervals at comparable resorts. RCI also operates the world's largest vacation ownership points-based vacation exchange network, RCI Points. This program allocates points to use rights that members cede to the vacation exchange program. Members may redeem their points for the use of vacation properties for the duration they choose in our vacation exchange program or for discounts on other services and products which may change from time to time, such as airfare, car rentals, cruises, hotels and other accommodations. RCI also offers enhanced membership tiers (Gold and Platinum), which provide additional benefits to members.

52. According to RCI's 2017-2018 Disclosure Guide, "some officers and/or directors of Wyndham Worldwide may from time to time serve as officers and/or directors of RCI."[2]

53. The relevant portion of RCI's 2017-2018 Disclosure Guide is depicted below:

RCI provides the RCI Weeks Exchange Program and other related services and benefits to Members. **Wyndham Worldwide Corporation ("Wyndham Worldwide") is the parent corporation of RCI and Fairfield Resort Management Services, Inc. ("FRMS"), a resort management company, Wyndham Vacation Resorts, Inc. ("WVR"), Wyndham Resort Development Corporation doing business as WorldMark by Wyndham ("WRDC"), Equivest Finance, Inc. ("Equivest"), and Wyndham Vacation Rentals North America, LLC ("WVRNA"), and their respective subsidiaries. Some officers and/or directors of Wyndham Worldwide may from time to time serve as officers and/or directors of RCI, FRMS, WVR, WRDC, Equivest, and/or WVRNA, and vice versa. FRMS, WVR, WRDC, Equivest and WVRNA Resorts are marked with a plus symbol "+" if applicable in the Resorts List, and Members List** both of which are attached hereto. Certain officers and directors of RCI may own, or have rights to acquire, shares of stock in Wyndham Worldwide. Other than as stated in this paragraph, neither RCI nor any of its officers or directors has any legal or beneficial interest in any developer, seller, managing entity or Vacation Ownership plan participating in the RCI Weeks Exchange Program. RCI is an independent exchange service company and is not owned, operated or controlled by a Resort, developer, seller, managing entity or Vacation Ownership plan participating in the RCI Weeks Exchange Program.

54. Upon information and belief, the JOHN DOE DEFENDANTS send unsolicited advertising facsimiles on behalf of Wyndham and RCI in an effort to help Wyndham and RCI avoid being sued for violating the TCPA.

55. Upon information and belief, Wyndham and RCI authorized the sending of unsolicited advertising facsimiles to Plaintiff and other persons to promote Wyndham and RCI products and services.

---

[2] On May 31, 2018, Wyndham changed its name from "Wyndham Worldwide Corporation" to "Wyndham Destinations, Inc."

### IV.    The Subject Facsimile

56.    On April 17, 2019, one or more of the Defendants sent (or caused to be sent) the below unsolicited facsimile advertisement to Plaintiff's Facsimile Number (the "Subject Facsimile"):



5 Days All Inclusive in our 5 Star Resort

## Just $149 per person

## 90% off

## 24 months to use

Your choice of Costa Rica , Dominican Republic or Cancun, Cabo San Lucas, Puerto Vallarta, or Isle of Loreto

Enjoy Unlimited Meals and Drinks, Free Scuba Lessons, Free Kayaks, Free Bicycles , Free Nightly Entertainment and Free Tennis and more

Bonus 5 Days in Orlando Florida

## Call 1-888-212-9408



To be removed from our distribution list, please call 1-888-997-4780

57.     The Subject Facsimile promotes the commercial availability of: "5 Days All Inclusive in our 5 Star Resort" and the Subject Facsimile was sent by one or more of the Defendants without Plaintiff's prior express invitation or permission, in writing or otherwise.

58.     The Subject Facsimile states in part: "Enjoy Unlimited Meals and Drinks, Free Scuba Lessons, Free Kayaks, Free bicycles, Free Nightly Entertainment and Free Tennis and more" and lists the following number "1-888-212-9408."

59.     The Subject Facsimile is an "unsolicited advertisement" as defined by 47 U.S.C. §227(a)(5) based upon is promotion and offer to sell vacation packages to Plaintiff and other similarly situated persons.

60.     One or more of the Defendants knew of and authorized the sending of the Subject Facsimile.

61.     Upon information and belief, the toll-free telephone number on the Subject Facsimile, 1-888-212-9408, is registered and/or affiliated with one or more of the Defendants.

62.     For example, if a recipient of a facsimile like the one sent to Plaintiff dials the number provided on the Subject Facsimile, the recipient would be connected to an employee, agent, or representative of one or more of the Defendants.

63.     If a recipient of a facsimile like the one sent to Plaintiff would call the number provided on the Subject Facsimile and was connected with a live person, and thereafter asked for the name of the company promoting or selling the vacation packages, the person on the other end of the call would provide RCI full corporate name and/or one of RCI's websites, https://rci-promotions.com/index.html



64.     Alternatively, if a recipient of a facsimile like the one sent to Plaintiff would call the number provided on the Subject Facsimile and was connected with a live persons, and thereafter asked for the name of the company promoting or selling the vacation packages, the person on the other end of the call would provide RCI full corporate name and/or one of RCI's website https://www.rci.com/pre-rci-en_US/special-offers/.

65.     As screen capture of this website is depicted below:



66.    RCI and Wyndam promote resorts, timeshares and vacation packages through the composition of and sending of similar unsolicited advertisements to consumers in this State.

67.    Plaintiff did not consent to, request or otherwise solicit the Subject Facsimile.

68.    The sending of the Subject Facsimile by one or more of the Defendants violated the TCPA.

69.    The Subject Facsimile is representative of Defendants' unlawful conduct towards other Illinois based recipients of identical or similar *unsolicited* facsimiles.

70.    Accordingly, on behalf of itself and all others similarly situated, Plaintiff brings this civil action to certify a class of persons and entities who were sent facsimile

advertisements, by one or more of the Defendants, without their prior express invitation or permission.

## V.     Violations of the TCPA

71.     The Subject Facsimile, by offering five (5) days in a resort, was and is an "unsolicited advertisement" as defined by 47 U.S.C. §227(a)(5) because the Subject Facsimile advertised and promoted the commercial availability of property, goods and/or services.

72.     As set forth above, one or more of the Defendants sent the Subject Facsimile to the Facsimile Number.

73.     The Subject Facsimile was transmitted by one or more of the Defendants individually or collectively without Plaintiff's "prior express invitation or permission, in writing or otherwise." 47 U.S.C. §227(a)(5).

74.     To the best of Plaintiff's knowledge, information and belief, none of the Defendants has or had a prior established business relationship with Plaintiff.

75.     Plaintiff's receipt of the Subject Facsimile caused Plaintiff to suffer concrete and actual harm. For example, Plaintiff, as recipient of the Subject Facsimile, temporarily lost the use of its Facsimile Machine and its paper, ink and toner for a period of time.

76.     Further, receiving, viewing and printing the Subject Facsimile wasted the Plaintiff's valuable time and the time of one of its employees. The time wasted to review the Subject Facsimile could have been spent on something else.

77.     The transmission of the Subject Facsimile interrupted and disturbed Plaintiff's right of privacy and right to not be disturbed with unsolicited advertising facsimiles.

78.     The transmission of the Subject Facsimile to Plaintiff's Facsimile Number tied up Plaintiff's Facsimile Number, caused Plaintiff's Facsimile Machine to use data, resulted in the unnecessary use of computer storage space and unauthorized usage of the Facsimile Machine's software and hardware.

79.     Contacting the sender of an unsolicited facsimile for the purpose of telling the sending party to stop sending unsolicited facsimiles wastes the time of the recipient.

## VI.     Vicarious Liability for Violations of the TCPA

80.     As a "seller[s]" of "unsolicited advertisements," Wyndham and RCI can be vicariously liable for utilizing third-parties to send unsolicited advertising facsimiles to Plaintiff and other persons.

81.     "Absent a clear expression of Congressional intent to apply another standard, the Court must presume that Congress intended to apply the traditional standards of vicarious liability with which it is presumed to be familiar, including the alter ego and agency doctrines." *Thomas v. Taco Bell Corp.,* 879 F. Supp.2d 1079, 1084 (C.D. Cal. 2012).

82.     Vicarious liability and agency principles apply under the TCPA to hold a party responsible and liable for TCPA violations committed by a third-party vendor. For example, in *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871 (9th Cir. 2014), the plaintiff alleged that the defendant, Campbell-Ewald Company ("Campbell"), had instructed or allowed a third-party vendor to send unsolicited text messages on behalf of the United States Navy –- with whom Campbell-Ewald had a marketing contract. *Gomez*, 768 F.3d at 873. Campbell argued that it could not be held liable for the alleged TCPA violations since it had outsourced the dialing and did not actually make any calls on behalf of its client. Id. at 877. The Ninth Circuit rejected this argument and ruled that the TCPA allowed for vicarious liability. *Id.* at 878-79 (a "defendant may be held vicariously liable

for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller.").

83.     Wyndham and RCI are vicariously liable for any violations of the TCPA caused by the JOHN DOE DEFENDANTS because, on information and belief, Wyndham and RCI received data from the JOHN DOE DEFENDANTS reflecting the Subject Facsimile in question.

84.     Wyndham and RCI are vicariously liable for any violations of the TCPA caused by the JOHN DOE DEFENDANTS because, on information and belief, Wyndham and RCI compensated the JOHN DOE DEFENDANTS if a person receiving the Subject Facsimile signs up for the promoted service(s).

## VII.    Causes of Action

### COUNT I – Individual Claim vs. Wyndham for Violations of the TCPA

85.     Plaintiff incorporate the above paragraphs as if fully set forth.

86.     The Subject Facsimile was an unsolicited advertisement as contemplated by the TCPA.

87.     The TCPA provides a private right of action to bring this action on behalf of Plaintiff. 47 U.S.C. §227(b)(3).

88.     Defendant Wyndham violated the TCPA and the regulations promulgated thereunder by sending the Subject Facsimile to Plaintiff without Plaintiff's permission and without a valid EBR.

89.     The Subject Facsimiles was intentionally sent to Plaintiff by Wyndham.

90.     Defendant Wyndham intentionally violated the TCPA by sending or causing the Subject Facsimile to be sent to Plaintiff without Plaintiff's permission and without a valid EBR.

WHEREFORE, Plaintiff, in its individual capacity, demands judgment in its

favor and against Defendant Wyndham as follows:

    a.    award Plaintiff up to $1,500 for Defendant's violation of the TCPA of sending it junk facsimiles without its consent and/or without an EBR;

    b.    enjoin Defendant from additional violations of the TCPA; and

    c.    award pre-judgment interest, costs, and such further relief as the Court may deem just and proper.

**COUNT II – Individual Claim vs. RCI for Violations of the TCPA**

91.    Plaintiff incorporate the above paragraphs as if fully set forth.

92.    The Subject Facsimile was an unsolicited advertisement as contemplated by the TCPA.

93.    The TCPA provides a private right of action to bring this action on behalf of Plaintiff. 47 U.S.C. §227(b)(3).

94.    Defendant RCI violated the TCPA and the regulations promulgated thereunder by sending the Subject Facsimile to Plaintiff without Plaintiff's permission and without a valid EBR.

95.    The Subject Facsimiles was intentionally sent to Plaintiff by RCI.

96.    Defendant RCI intentionally violated the TCPA by sending or causing the Subject Facsimile to be sent to Plaintiff without Plaintiff's permission and without a valid EBR.

WHEREFORE, Plaintiff, in its individual capacity, demands judgment in its favor and against Defendant RCI as follows:

    a.    award Plaintiff up to $1,500 for Defendant's violation of the TCPA of sending it junk facsimiles without its consent and/or without an EBR;

    b.    enjoin Defendant from additional violations of the TCPA; and

    c.    award pre-judgment interest, costs, and such further relief as the Court may deem just and proper.

**COUNT III – Individual Claim for Violations of the TCPA vs. All Defendants**

97.    Plaintiff incorporate the above paragraphs as if fully set forth.

98.    The Subject Facsimile was an unsolicited advertisement as contemplated by the TCPA.

99.    The TCPA provides a private right of action to bring this action on behalf of Plaintiff. 47 U.S.C. §227(b)(3).

100.    As set forth above, one or more of the JOHN DOE DEFENDANTS violated the TCPA and the regulations promulgated thereunder by sending the Subject Facsimile to Plaintiff without Plaintiff's permission and without a valid EBR.

101.    The Subject Facsimiles was intentionally sent to Plaintiff by one or more of the JOHN DOE DEFENDANTS.

102.    One or more of the JOHN DOE DEFENDANTS intentionally violated the TCPA by sending or causing the Subject Facsimile to be sent to Plaintiff without Plaintiff's permission and without a valid EBR.

103.    To the extent that one or more of the JOHN DOE DEFENDANTS violated the TCPA, its or their conduct can be imputed to Wyndham and RCI because when the JOHN DOE DEFENDANT(s) sent the Subject Facsimile in question, it did so on behalf of and for the benefit of Wyndham and RCI.

104.    Wyndham and RCI are vicariously liable for any violations of the TCPA caused by the one or more of the JOHN DOE DEFENDANTS because, on information and belief, Wyndham and RCI authorized or instructed the JOHN DOE DEFENDANTS to send the Subject Facsimile in question.

WHEREFORE, Plaintiff, in its individual capacity, demands judgment in its

favor and against all Defendants as follows:

    a.    award Plaintiff up to $1,500 for each JOHN DOE DEFENDANTS' violation of the TCPA of sending it junk facsimiles without its consent and/or without an EBR;

    b.    declare that Wyndham is vicariously liable for any TCPA violations caused by the JOHN DOE DEFENDANTS and require it to pay for any damages awarded in regard to paragraphs a and b;

    c.    declare that RCI is vicariously liable for any TCPA violations caused by the JOHN DOE DEFENDANTS and require it to pay for any damages awarded in regard to paragraphs a and b;

    d.    enjoin all Defendants from additional violations of the TCPA; and

    e.    award pre-judgment interest, costs, and such further relief as the Court may deem just and proper.

## VIII. Class Action Allegations

105. Plaintiff incorporates Sections I through VII as if fully set forth above.

106. Common questions of law and fact apply to the claims of all class members. The common material questions of fact and law include, but are not limited to, the following:

    a. Whether one or more of the Defendants sent unsolicited fax advertisements;

    b. Whether the facsimiles advertised the commercial availability or quality of property, goods, or services;

    c. The manner and method one or more of the Defendants used to compile or obtain the list of fax numbers to which they sent the Subject Facsimiles:

    d. Whether one or more of the Defendants faxed advertisements without first obtaining the recipients' prior invitation or permission;

    e. Whether one or more of the Defendants violated the provisions of 47 U.S.C. §227 and the regulations promulgated thereunder;

    f. Whether Defendants should be enjoined from faxing advertisements in the future;

g. Whether Plaintiff and the other members of the class are entitled to statutory damages; and

h. Whether the Court should award treble damages.

107. Plaintiff's claims are typical of the claims of all class members.

108. Plaintiff and other members of the class received the same or similar facsimiles as the facsimiles sent by or on behalf of one or more of the Defendants advertising products, goods and services of one or more of the Defendants during the Class Period.

109. Defendants have acted in the same or in a similar manner with respect to Plaintiff and all the class members by sending Plaintiff and each member of the class the same or similar facsimiles, which were sent without prior express invitation or permission.

110. Plaintiff is making the same claims and seeking the same relief for itself and all class members based upon the same federal statute.

111. Plaintiff will adequately represent and protect the interests of the class and has no interest that conflict with absent class members.

112. Plaintiff's counsel, James C. Vlahakis, is an experienced consumer class action litigator. For example, Mr. Vlahakis has been appointed to serve as a Steering Committee Member in the case of *In re: Apple Inc. Device Performance Litigation*, 18-MD-02827 (N.D. Cal. May 5, 2018).

113. Additionally, Mr. Vlahakis has defended and/or prosecuted over two hundred consumer-based civil actions since 1998.

114. The following is a summary of results obtained by Mr. Vlahakis:

a. <u>Class Action Settlements</u>. In conjunction with class counsel, Mr. Vlahakis has received court approval of approximately two dozen FDCPA based class action settlements. Further, in conjunction with class counsel, courts have approved the following multi-million-dollar TCPA based class action settlements. *See, e.g.,In*

*Re Capital One Telephone Consumer Protection Act Litigation*, 2012-cv-10064 (N.D. Ill.) ($75 million dollar TCPA based automated dialing system settlement); *Prater v. Medicredit, Inc.*, 2014-cv-0159 ($6.3 million dollar TCPA based automated dialing system wrong party settlement); *INSPE Associates v. CSL Biotherapries, Inc.* (N.D. Ill.) ($3.5 million fax based settlement);

b. <u>Class Certification Rulings</u>. Defeating a TCPA cell-phone based class certification motion in *Jamison v. First Credit Services, Inc.*, 290 F.R.D. 92 (N.D. Ill. Mar. 28, 2013), reconsideration denied, 2013 U.S. Dist. LEXIS 105352 (N.D. Ill. July 29, 2013) and decertifying a TCPA based class action in *Pesce v. First Credit Services, Inc.*, 2012 U.S. Dist. LEXIS 188745 (N.D. Ill. June 6, 2012);

c. <u>Federal Communication Commission ("FCC") proceedings</u>. Obtaining favorable declaratory relief for a client before the FCC relative to a TCPA junk facsimile-based cause of action (*see* FCC's Order of October 30, 2014, FCC14-164, in CG Docket Nos. 02-278 and 05-338); and

d. <u>Appellate proceedings</u>. On September 5, 2019, the Consumer Finance Protection Bureau filed an amicus brief in support of Mr. Vlahakis' client in an appeal pending before the U.S. Court of Appeals for the *Seventh Circuit, Preston v. Midland Credit Management, Inc.*, 18-3119.

115. Class certification is appropriate because the prosecution of individual actions by class members would: (a) create the risk of inconsistent adjudications that could establish incompatible standards of conduct for Defendants, and/or (b) as a practical matter, adjudication of the Plaintiff's claims will be dispositive of the interests of class members who are not parties.

116. Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

a. The evidence of the absence of consent relative to putative class members will result in the fair and efficient adjudication of class members' claims without the need for separate or individualized proceedings;

b. Evidence regarding defenses or any exceptions to liability that Defendants may assert and attempt to prove will come from business records and will not require individualized or separate inquiries or proceedings;

c. Defendants have acted and are continuing to act pursuant to common policies or practices in the same or similar manner with respect to all class members;

d. The amount likely to be recovered by individual class members does not support individual litigation;

e. A class action will permit a large number of relatively small claims involving virtually identical facts and legal issues to be resolved efficiently in one proceeding based upon common proofs;

f. This case is inherently manageable as a class action in that Defendants:

   (i) specifically targeted persons (both businesses and individuals) to receive unsolicited facsimile transmissions ;

   (ii) purchased a list of advertising leads from a third-party;

g. This case is inherently manageable as a class action in that Defendants:

   (i) business records from Defendants will readily identify class members and establish liability and damages;

   (ii) business records from one or more third-parties will readily identify class members and establish liability and damages;

h. Liability and damages can be established for the Plaintiff and the class with the same common proofs because statutory damages are provided for in the statute and are the same for all class members and can be calculated in the same or a similar manner;

i. A class action will result in an orderly and expeditious administration of claims and it will foster economics of time, effort and expense;

j. A class action will contribute to uniformity of decisions concerning the actions taken by Defendants; and

k. the claims of the class are likely to go unaddressed absent class certification.

117. More than forty (40) Illinois companies or persons in the State of Illinois received the Subject Facsimile or something similar to the Subject Facsimile without their consent and were harmed in a similar manner as alleged above by Plaintiff.

118.    Upon information and belief, because unsolicited facsimiles are generally sent out *en masse*, and because Plaintiff did not consent to receive the Subject Facsimiles, it is plausible to allege that one or more of the Defendants have individually or collectively sent, and continue to send, dozens, and up to hundreds of similar unsolicited advertisements via facsimile in violation of the TCPA.

119.    The TCPA provides a private right of action to bring this action on behalf of Plaintiff and the putative class members to redress Defendants' violations of the Act and provides for statutory damages. 47 U.S.C. §227(b)(3).

120.    Plaintiff intends to certify a class which includes the Subject Facsimile and all other similar unsolicited advertising facsimiles sent during the four years prior to the filing of this civil action through the present.

121.    The unlawful sending of the Subject Facsimile and other similar unsolicited facsimiles to Plaintiff and other putative class members caused Plaintiff and the putative class members to suffer damages.

122.    The unlawful sending of the Subject Facsimile to Plaintiff and the unlawful sending of other similar unsolicited facsimiles to class members caused Plaintiff and the recipients to use and waste paper and toner when they printed the subject facsimiles.

123.    The unlawful sending of the Subject Facsimile to Plaintiff and the unlawful sending of other similar unsolicited facsimiles to class members occupied and/or depleted their telephone lines, data lines, computer storage related to the operation of their facsimile machines.

124.    The unlawful sending of the Subject Facsimile to Plaintiff and the unlawful sending of other similar unsolicited facsimiles to class members caused Plaintiff and the class members and/or their employees to waste time receiving, reviewing and routing the unsolicited and unlawful facsimiles.

24

125. This wasted time could have been spent on the Plaintiff's and the other class members' business activities.

126. Just like with Plaintiff, Defendants cannot demonstrate that they had the consent of the recipients of each facsimile advertisement.

127. The unlawful sending of the Subject Facsimile to Plaintiff and the unlawful sending of other similar unsolicited facsimiles to class members interrupted the Plaintiff's and other class members' privacy interests in being left alone and free from unsolicited "junk" facsimiles.

**COUNT IV – Class Action Claims vs. Wyndham**

128. Plaintiff incorporate the above paragraphs as if fully set forth.

129. The Subject Facsimiles were intentionally sent to putative class members by Wyndham.

130. Defendant Wyndham violated the TCPA and the regulations promulgated thereunder by sending the Subject Facsimile to putative class members without the permission of the putative class members and without a valid EBRs.

131. Defendant Wyndham intentionally violated the TCPA by sending or causing the Subject Facsimile to be sent in this manner.

132. In accordance with FRCP 23(b)(1), (b)(2) and (b)(3), Plaintiff brings this class action pursuant to the TCPA, on behalf of the following class of persons:

> All persons in the United States who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimiles of material advertising the commercial availability or quality of any property, goods, or services by Wyndham and in particular, vacation packages like the one attached to this Notice (attaching the Subject Fax).

133. Since Defendant Wyndham has the burden of proof of demonstrating consent, it is free to assert that it had obtained "prior express invitation or permission"

to send fax advertisements or that it has or had an established business relationship with proposed class members.

134.    Alternatively, Plaintiff intends the above class to include everyone who received similar variations of unsolicited facsimile advertisement.

135.    Alternatively, Plaintiff brings this class action pursuant to the TCPA, on behalf of the following class of persons:

> All persons located in the State of Illinois who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimiles of material advertising the commercial availability or quality of any property, goods, or services by Wyndham and in particular, vacation packages like the one attached to this Notice (attaching the Subject Fax).

WHEREFORE, Plaintiff, on behalf of the above defined class members, demands judgment in its favor and against Defendant Wyndham:

a.    award class members up to $1,500 for Defendant's "willful or knowing" violations of the TCPA ;

b.    enjoin Defendant from additional violations of the TCPA; and

c.    award pre-judgment interest, costs, and such further relief as the Court may deem just and proper.

**COUNT V – Class Action Claims vs. RCI**

136.    Plaintiff incorporate the above paragraphs as if fully set forth.

137.    Defendant RCI violated the TCPA and the regulations promulgated thereunder by sending the Subject Facsimile to putative class members without the permission of the putative class members and without a valid EBRs.

138.    Defendant RCI intentionally violated the TCPA by sending or causing the Subject Facsimile to be sent in this manner.

139.    In accordance with FRCP 23(b)(1), (b)(2) and (b)(3), Plaintiff brings this class action pursuant to the TCPA, on behalf of the following class of persons:

> All persons in the United States who (1) on or after four

> years prior to the filing of this action, (2) were sent telephone facsimiles of material advertising the commercial availability or quality of any property, goods, or services by RCI and in particular, vacation packages like the one attached to this Notice (attaching the Subject Fax).

140. Since RCI has the burden of proof of demonstrating consent, it is free to assert that it had obtained "prior express invitation or permission" to send fax advertisements or that it has or had an established business relationship with proposed class members.

141. Alternatively, Plaintiff intends the above class to include everyone who received similar variations of unsolicited facsimile advertisement.

142. Alternatively, Plaintiff brings this class action pursuant to the TCPA, on behalf of the following class of persons:

> All persons located in the State of Illinois who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimiles of material advertising the commercial availability or quality of any property, goods, or services by RCI and in particular, vacation packages like the one attached to this Notice (attaching the Subject Fax).

WHEREFORE, Plaintiff, on behalf of the above defined class members, demands judgment in its favor and against Defendant RCI:

a. award class members up to $1,500 for Defendant's "willful or knowing" violations of the TCPA ;

b. enjoin Defendant from additional violations of the TCPA; and

c. award pre-judgment interest, costs, and such further relief as the Court may deem just and proper.

### COUNT VI – Class Action Claims vs. All Defendants

143. Plaintiff incorporate the above paragraphs as if fully set forth.

144. One or more of the JOHN DOE DEFENDANTS violated the TCPA and the regulations promulgated thereunder by sending the Subject Facsimile to putative class

members without the permission of the putative class members and without a valid EBRs.

145. One or more of the JOHN DOE DEFENDANTS intentionally violated the TCPA by sending or causing the Subject Facsimile to be sent in this manner.

146. In accordance with FRCP 23(b)(1), (b)(2) and (b)(3), Plaintiff brings this class action pursuant to the TCPA, on behalf of the following classes of persons:

> All persons in the United States who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimiles of material advertising the commercial availability or quality of any property, goods, or services by [insert Defendant name] on behalf of Wyndham, and in particular, vacation packages like the one attached to this Notice (attaching the Subject Fax).

> All persons in the United States who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimiles of material advertising the commercial availability or quality of any property, goods, or services by [insert Defendant name] on behalf of RCI, and in particular, vacation packages like the one attached to this Notice (attaching the Subject Fax).

147. Since Defendants have the burden of proof of demonstrating consent, they are free to assert that they had obtained "prior express invitation or permission" to send fax advertisements or that they had an established business relationship with proposed class members.

148. Alternatively, Plaintiff intends the above class to include everyone who received similar variations of unsolicited facsimile advertisement.

149. To the extent that one or more of the JOHN DOE DEFENDANTS violated the TCPA, its or their conduct can be imputed to Wyndham and RCI because when the JOHN DOE DEFENDANT(s) sent the Subject Facsimile in question, it did so on behalf of and for the benefit of Wyndham and RCI.

150.    Wyndham and RCI are vicariously liable for any violations of the TCPA caused by the one or more of the JOHN DOE DEFENDANTS because, on information and belief, Wyndham and RCI authorized or instructed the JOHN DOE DEFENDANTS to send the Subject Facsimile in question.

151.    Alternatively, Plaintiff brings this class action pursuant to the TCPA, on behalf of the following class of persons:

> All persons located in the State of Illinois who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimiles of material advertising the commercial availability or quality of any property, goods, or services [insert Defendant name] on behalf of Wyndham, and in particular, vacation packages like the one attached to this Notice (attaching the Subject Fax).

> All persons located in the State of Illinois who (1) on or after four years prior to the filing of this action, (2) were sent telephone facsimiles of material advertising the commercial availability or quality of any property, goods, or services [insert Defendant name] on behalf of RCI, and in particular, vacation packages like the one attached to this Notice (attaching the Subject Fax).

WHEREFORE, Plaintiff, on behalf of the above defined class members, demands judgment in its favor and against all Defendants:

a.      award class members up to $1,500 for each Defendants' "willful or knowing" violations of the TCPA ;

b.      declare that Defendant Wyndham and/or RCI vicariously liable for the conduct of any JOHN DOE DEFENDANT(S);

c.      enjoin Defendants from additional violations of the TCPA; and

d.      award pre-judgment interest, costs, and such further relief as the Court may deem just and proper.

**Count VII – Class Action Claim Pursuant to the Illinois Consumer Fraud Act**

152.    As alleged above, all of the Defendants are and were engaged in commerce in the State of Illinois with regard to Plaintiff.

153. Defendant Wyndham violated Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.*, by sending or causing the Subject Facsimile to be sent to Plaintiff and other Class Members.

154. Defendants RCI violated Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.*, by sending or causing the Subject Facsimile to be sent to Plaintiff and other Class Members.

155. One or more of the JOHN DOE DEFENDANTS violated Illinois Consumer Fraud Act, 815 ILCS 505/1, *et seq.*, by sending or causing the Subject Facsimile to be sent to Plaintiff and other Class Members.

156. The Facsimiles are "advertisement[s]" as the term is defined by Section 505/1(a) of the ICFA.

157. Plaintiff is a "person" as defined by Section 505/1(c) of the ICFA.

158. Defendant Wyndham treated Plaintiff as a "consumer" as this term is defined by Section 505/1(e) of the ICFA because it sought to solicit payment from Plaintiff for what was being advertised on the Subject Facsimile.

159. Defendant RCI treated Plaintiff as a "consumer" as this term is defined by Section 505/1(e) of the ICFA because it sought to solicit payment from Plaintiff for what was being advertised on the Subject Facsimile.

160. One or more of the JOHN DOE DEFENDANTS treated Plaintiff as a "consumer" as this term is defined by Section 505/1(e) of the ICFA because they sought to solicit payment from Plaintiff for what was being advertised on the Subject Facsimile.

161. The Subject Facsimiles is an "advertisement" as this term is defined by Section 505/1(a) of the ICFA.

162. According to Section 505/1(a) of the ICFA:

> The term "advertisement" includes the attempt by publication, dissemination, solicitation or circulation to induce directly or

indirectly any person to enter into any obligation or acquire any title or interest in any merchandise and includes every work device to disguise any form of business solicitation by using such terms as "renewal", "invoice", "bill", "statement", or "reminder", to create an impression of existing obligation when there is none, or other language to mislead any person in relation to any sought after commercial transaction.

163.   The Subject Facsimiles are a form of a "sale" as this term is defined by Section 505/1(d) of the ICFA.

164.   According to Section 505/1(d) of the ICFA, "[t]he term "sale" includes any sale, offer for sale, or attempt to sell any merchandise for cash or on credit."

165.   The Subject Facsimile was a form of "trade" and/or "commerce" as these terms are defined by Section 505/1(f) of the ICFA.

166.   According to Section 505/1(f) of the ICFA:

The terms "trade" and "commerce" mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

167.   The ICFA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices."

168.   In relevant part, Section 505/2 states as follows:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" . . . in the conduct of any trade or commerce. . . .

169.   As alleged above and detailed below, one or more of the Defendants violated Section 505/10a(a) of the ICFA.

170.   Plaintiff did not consent to receiving the Subject Facsimile.

171.    As set forth above, one or more of the Defendants violated ICFA by transmitting the Subject Facsimile without Plaintiff's consent.

172.    As set forth above, one or more of the Defendants intentionally sent the Subject Facsimiles, and the sending of the Subject Facsimiles constitutes an unfair or deceptive act or practice "in the course of conduct involving trade or commerce."

173.    Plaintiff suffered tangible damages as a result of receiving the Subject Facsimile in the form of wasted toner and paper, wear and tear of the subject facsimile machine, and time wasted in terms of having to look at, print and dismiss the Subject Facsimile for what it is – unsolicited junk.

174.    Sending unsolicited facsimiles offends public policy.  Not only is the sending of unsolicited facsimiles unlawful under the TCPA, it is a misdemeanor criminal offense under Illinois law.  *See* 720 ILCS 5/26-3.

175.    Sending unsolicited facsimiles is oppressive because unsolicited facsimiles impose a lack of meaningful choice and/or an unreasonable burden upon recipients.

176.    A practice of sending unsolicited faxes does deprive consumers of choice, given that they cannot avoid such faxes without turning off their fax machines.

177.    Costs that are imposed on an unwilling consumer can constitute a substantial injury.

178.    Because unsolicited facsimiles are generally sent out *en masse*, and because Plaintiff did not consent to receive the Subject Facsimile, it is plausible to allege that one or more of the Defendants have sent, and continue to send, dozens, and up to hundreds of similar unsolicited advertisements via facsimile in violation of ICFA.

179.    On information and belief, more than forty (40) Illinois companies or persons in the State of Illinois received similar unsolicited facsimiles as the Subject

Facsimile without their consent and were harmed in a similar manner as alleged above by Plaintiff.

180.    As alleged above, unsolicited faxes impose costs on unwilling consumers, by wasting paper and toner, wearing down fax machines, and consuming employee time.

181.    On information and belief, one or more of the Defendants have sent at least three dozen similar unsolicited facsimiles to people and/or business entities in Illinois.

182.    Defendants' practice of sending unsolicited facsimiles has violated Illinois public policy, deprived persons and businesses of the choice to not receive advertising faxes, and caused a significant amount of harm to consumers, taken in the aggregate.

183.    Accordingly, the Complaint plausibly suggests that the aggregate harm caused by this practice would constitute substantial harm and thus unfair within the meaning of the ICFA.

WHEREFORE, Plaintiff, in his individual capacity, demands judgment in its favor and against all Defendants, as follows:

a.  award Plaintiff and the class members an amount to be determined to reimburse Plaintiff and the class members for the amount of harm caused by Defendants' violations of ICFA;

b.  award punitive damages;

c.  award statutory attorney's fees and costs pursuant to ILCS 505/10a(c);

d.  declare that Defendant Wyndham and/or RCI vicariously liable for the conduct of any JOHN DOE DEFENDANT(S);

e.  enjoin Defendants from additional violations of ICFA; and

f.  that the Court award pre-judgment interest, costs, and such further relief as the Court may deem just and proper.

**Plaintiff hereby demands a jury trial.**

DATED: October 22, 2019

Respectfully submitted,

Plaintiff DIAMOND MOTORWORKS,
individually, and as the representatives of
a class of similarly situated persons

/s/ James C. Vlahakis

James C. Vlahakis
Sulaiman Law Group, Ltd
2500 South Highland Avenue #200
Lombard, IL 60148
Phone: (630) 581-5456
jvlahakis@sulaimanlaw.com